# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 18-1977V**
**Filed: April 19, 2021**
PUBLISHED

| | |
|---|---|
| MICHAEL MEZZACAPO,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner<br><br>Finding of Fact; Shoulder Injury Related to Vaccine Administration (SIRVA); Tetanus Diphtheria Pertussis Vaccine (Tdap) |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*
*Voris Edward Johnson, U.S. Department of Justice, Washington, DC, for respondent.*

## FINDING OF FACT[1]

On December 27, 2018, petitioner, Michael Mezzacapo, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §300aa-10-34 (2012), alleging that he suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") following the receipt of a tetanus/diphtheria/pertussis vaccine ("Tdap") in his right arm at a Rite Aid pharmacy on August 29, 2017. (ECF No. 1, p. 1.) Although petitioner alleged that the injection site was in his right arm, an immunization information summary provided by Rite Aid to petitioner's primary care physician and contained in petitioner's medical records notes that the injection site was the left arm, a fact that, if true, would be fatal to petitioner's claim. (Ex. 4, p. 21.)

On January 21, 2021, petitioner moved for a ruling on the record finding that the injection site of his Tdap vaccination was his right arm. (ECF No. 40.) For the reasons discussed below, I find that petitioner's Tdap vaccination was more likely than not administered in his right arm.

[1] Because this finding contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the finding will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

## I. Procedural History

This case was initially assigned to the Special Processing Unit ("SPU"). (ECF No. 5.) Petitioner filed medical records and a statement of completion on January 7, 2019. (ECF Nos. 6, 7.) Included in petitioner's filing was a hand-written, unsigned "immunization record card" which stated that petitioner received a Tdap booster in his right arm. (Ex. 1, p. 2.) However, petitioner also filed primary care records that included a Rite Aid immunization summary sent to his treating physician noting that he had received both a flu vaccination and a Tdap and vaccination at the same visit and both were administered in his left arm. (Ex. 4, p. 21.) That document is not itself an administration record. Rather, it indicates that "[a]n immunization record was completed and given to the patient." (*Id.*)

On March 4, 2019, then Chief Special Master Dorsey issued a scheduling order indicating that petitioner had submitted medical records which conflict on the issue of injection site and specific vaccines received. (ECF No. 9.) Petitioner was ordered to file a motion for authority to issue a subpoena upon Rite Aid Pharmacy in order to obtain his complete vaccination records, including a "Screening Questionnaire and Consent Form" which would indicate the correct injection site and vaccines received. (*Id.*) Petitioner was also ordered to file an affidavit addressing additional elements required by §11(c)(1) of the Vaccine Act and explaining the facts and circumstances surrounding the creation of petitioner's immunization record card, and any other evidence that would authenticate the immunization record card.

On April 3, 2019, petitioner filed a motion to issue a subpoena to Rite Aid of Delaware. (ECF No. 10.) Petitioner's motion for subpoena authorization was granted on April 4, 2019. (ECF No. 11.) On August 19, 2019, petitioner filed additional medical records, an affidavit, and a status report explaining that Rite Aid had failed to provide any records in response to petitioner's subpoena, and that due to the acquisition of "nearly two thousand" Rite Aid locations by Walgreens, there was "much confusion" regarding the location of petitioner's medical records. (ECF Nos. 20, 21; Exs. 8-10.)

Respondent filed his Rule 4 report on January 24, 2020, noting the discrepancy between petitioner's immunization record documenting both injection sites as being in his left arm, and the handwritten, unsigned immunization card stating that petitioner received the Tdap vaccine in his right arm. (ECF No. 26, p. 7.) Respondent argued that the immunization summary was more reliable than the card, and that it is more likely that petitioner received the Tdap vaccine in his left arm. (*Id.*) This case was assigned to my docket on August 14, 2020. (ECF No. 34.)

On August 5, 2020, petitioner filed a written statement from Rite Aid pharmacist Vera Perkucin explaining that she administered petitioner's flu vaccine in his left deltoid and his Tdap vaccine in his right deltoid. (ECF No. 31.) Respondent's counsel emailed my chambers on August 17, 2020, indicating that respondent wished to depose Ms. Perkucin. The same day, I issued a non-pdf scheduling order directing respondent to file a motion to issue a subpoena or otherwise indicate how he intended to proceed. On

September 22, 2020, respondent filed a motion to issue a subpoena to depose Ms. Perkucin, which I granted on the following day. (ECF Nos. 37, 38.) Respondent filed Ms. Perkucin's deposition transcript on November 24, 2020. (ECF No. 39-1.)

During the deposition, in addition to providing substantive testimony Ms. Perkucin confirmed that a consent form documenting petitioner's vaccination does exist, but indicated that she could not volunteer a copy. She advised that such a request would need to be addressed to Rite Aid corporate offices. Although the parties initially suggested they would cooperate to pursue that discovery, they apparently reached an impasse regarding the burden and usefulness of seeking the discovery in light of petitioner's prior unsuccessful attempt to subpoena that document. (*Compare* ECF No. 39-1, p. 6-7, 10 and ECF Nos. 42-43.)

No request for formal discovery was filed by either party subsequent to the deposition; however, on January 21, 2021, petitioner filed a motion for a finding of fact. (ECF No. 40.) Respondent filed a response to petitioner's motion on February 19, 2021. (ECF No. 42.) Petitioner filed a reply on February 26, 2021. (ECF No. 43.) Accordingly, petitioner's motion is ripe for resolution.

## II. Factual History[2]

### a. As reflected in petitioner's medical records

During the relevant period, petitioner received his primary care from Dr. Victor A. Shada. (*See* Ex. 4, pp. 8-10, 11-18.) Prior to his vaccination, petitioner underwent a variety of gastrointestinal exams and surgeries related to a condition called barret's esophagus. (*See generally* Ex. 5, pp. 19-117.) Beyond his gastrointestinal procedures, petitioner's medical history included a hernia surgery, head trauma from a motor vehicle accident in 1994, and a 2011 colonoscopy and polyp removal. (Ex. 4, p. 5.)

Petitioner received flu and Tdap vaccinations on August 29, 2017. (Ex. 1, pp. 1-2; Ex. 4, p. 21.) Petitioner filed a vaccine immunization card noting that the Tdap vaccine was administered in his upper right arm (with no record of the flu vaccination), while a Rite Aid immunization summary sent to Dr. Shada notes that both petitioner's flu and Tdap vaccines were administered in his upper left deltoid. (*Id.*)

On September 23, 2017, petitioner reported to the Hallmark Health System Emergency Department ("ED") with a chief complaint of "right shoulder pain after tetnus[sic] injection 8/29/17." (Ex. 7, p. 4.) The ED physician noted that petitioner experienced pain on palpation to his deltoid but had full range of motion. Petitioner reported that his level of pain was zero. (*Id.*) Petitioner's shoulder x-ray was negative, and he was discharged with recommendations to contact an orthopedic specialist and continue taking ibuprofen for pain management. (*Id.* at 7, 10-11.)

---

[2] Although I have reviewed the entirety of the record compiled to date, including petitioner's complete medical history, the factual history discussed in this decision is limited to describing the evidence bearing on the correct administration site of petitioner's 2017 Tdap vaccination.

Petitioner was next seen by Dr. Shada on November 15, 2017 for "shoulder trouble." (Ex. 4, p. 5.) Petitioner reported that his right shoulder pain began in August after his tetanus vaccination. (*Id.*) Dr. Shada diagnosed petitioner with acute right shoulder pain and recommended an MRI. (*Id.* at 6.)

On November 27, 2017, petitioner was seen by Dr. Shada to discuss his upcoming MRI and additional treatment for his shoulder issue. (Ex. 4, p. 3.) Dr. Shada again noted that petitioner's pain began after he received an injection in his right deltoid. (*Id.*) Dr. Shada recommended an MRI and physical therapy. (*Id.*)

Petitioner began physical therapy at the Advanced Rehabilitation Center on November 27, 2017. (Ex. 2, p. 38.) He again reported that his pain began after receiving a Tdap vaccine in his right arm. (*Id.*) Petitioner's physical therapy evaluation revealed a pain level of 8 out of 10, but no limitations in his range of motion. (*Id*. at pp. 35, 38.) Petitioner's physical therapist noted "[t]enderness into supraspinatus tendon . . . ." and suspected that the tetanus shot "may have irritated [the] tendon causing [a] localized inflammatory response with scar tissue built up in deltoid." (*Id.* at 36, 38, 39.) Petitioner continued physical therapy from November 27, 2017 until December 27, 2017, attending ten sessions in all. (*see* Ex. 2, pp. 4-38.) During these visits, petitioner continually improved and was ultimately discharged with a pain level of 2 out of 10. (*Id.* at 5.)

Petitioner underwent a right shoulder MRI without contrast on January 3, 2018. (Ex. 3, p. 17.) The technician observed a "[l]arge tear in the superior and posterior glenoid labrum. Mild tendinosis of the supraspinatus tendon. . ." and "[d]egenerative changes in both the glenohumeral and acromioclavicular joints." (*Id.* at 17-18.)

On February 16, 2018, petitioner saw Dr. G.B. Holloway for an orthopedic consultation. (Ex. 3, pp. 4-8.) Dr. Holloway noted that petitioner's pain began after receiving a tetanus vaccine in his right deltoid. (*Id.* at 4.) Petitioner saw Dr. Holloway twice more on February 28 and April 4 of 2018 where he reiterated that his pain began following an Tdap injection in his right arm. (*Id.* at 9-13, 23-26; Ex. 6, pp. 1-4.)

Petitioner was also examined by Physicians Assistant Megan E. Huddleston on February 28, 2018 for his annual physical. (Ex. 8, pp. 1-3.) PA Huddleston did not mention petitioner's vaccination on this visit. (*Id.*)

On April 12, 2019, petitioner returned to physical therapy to reevaluate his home exercise program and maintain his shoulder function when he left town for work. (Ex. 9, p. 3.) During this evaluation, petitioner reported that his pain began following a Tdap vaccination in his right shoulder. (*Id.*) Petitioner returned to physical therapy on May 7, 2019. (*Id.* at 11.) He again reported during his physical therapy exam that his pain began after a tetanus shot was administered in his right arm. (*Id.*)

**b. As described in testimony**

i. Petitioner's affidavit

On August 19, 2019, petitioner filed an affidavit detailing his vaccine administration, onset of pain, and subsequent medical treatment. (Ex. 10.) Petitioner stated "I received a tetanus shot in my upper right arm and I experienced pain immediately, pain I've never felt before." (*Id*. at 1.) Petitioner further indicated that when he reported to the emergency department for his shoulder pain, his treating physician recommended an x-ray "to see if there was perhaps a broken needle in my [right] arm." (*Id.*) Petitioner concluded his affidavit by stating that "[t]here is no doubt that on August 29, 2017, I was injured in my right arm by this tetanus vaccination. I do not have any independent recollection of the creation of my vaccine administration card." (*Id.* at 2.)

ii. Vera Perkucin's testimony

Petitioner initially filed a written statement from Pharmacist Vera Perkucin on August 5, 2020. (Ex. 11.) Ms. Perkucin's statement reads, "My name is Vera Perkucin. I am the pharmacist who administered influenza and tetanus vaccines to [petitioner] on August 29, 2017. [Petitioner] received the Tetanus vaccine in the upper right deltoid. The flu vaccination was administered in the left deltoid." (Ex. 11, p. 1.) Ms. Perkucin was later deposed on October 22, 2020. (ECF No. 39-1) ("Tr.".)

During the deposition, Ms. Perkucin confirmed that she had no independent recollection of petitioner or of administering his vaccinations. (Tr. 5, 9.) However, she indicated that the basis for her previously submitted written statement was a review of a "clinic questionnaire" that gets filled out in connection with the administration of vaccinations. (*Id*. at 5-6.) During the deposition this was also referred to as a "consent form." (*Id*.) Because Rite Aid did not produce documents in response to petitioner's subpoena, this document is not a part of the record of this case. Ms. Perkucin indicated that she could not volunteer a copy of the document, noting that such a request would have to go "through corporate." (*Id*. at 10.) As noted above, subsequent to the deposition, neither party sought further discovery to obtain this document.

Respondent's counsel asked Ms. Perkucin to review the Rite Aid immunization summary contained in petitioner's medical records and filed at Exhibit 4, page 21, which shows that both of petitioner's vaccinations had been administered in his left shoulder. (*Id.* at 7-8; *see also* Ex. 4, p. 21.) Ms. Perkucin explained that that form was generated based on what she preliminarily put into the system to process petitioner's vaccination through his insurance. She indicated it is generated in advance of determining the injection site. She confirmed that it is her habit and practice of inputting "left" for the injection site at this stage because the majority of people are right-hand dominant. However, in petitioner's case she subsequently documented on petitioner's consent form that his Tdap vaccination was administered in his right shoulder. (*Id*. at 8-9.) Ms. Perkucin also testified that her usual practice for administering two vaccines is to

administer one in each arm. (Tr. at 11.) Ms. Perkucin denied any knowledge of the "Immunization Record Card" filed as Exhibit 1. (*Id*. at 10.)

## III. Legal Standard

Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove their claim by a preponderance of the evidence. A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1). However, the Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Additionally, medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems.) *Curcuras*, 993 F.2d at 1528; *Doe v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law.") This presumption is based on the propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of the relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), *mot. for rev. denied,* 142 Fed. Cl. 247, 251-52 (2019), *vacated on other grounds and remanded*, 809 Fed. Appx. 843 (Fed Cir. 2020); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl.Ct. 537, 543 (1992), *aff'd*, 993 F.2d 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").

Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule is not absolute. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117474 at *19. Importantly, the Court of Federal Claims observed that "[i]f a record was prepared by a disinterested person who later acknowledged that the entry was incorrect in some respect, the later correction

must be taken into account." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting the decision below), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). Further, the Special Master must consider the credibility of the individual offering the testimony. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). In determining whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, there must be evidence that this decision was the result of a rational determination. *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 417.

## IV. Party Contentions

In his motion, petitioner acknowledges the inconsistency reflected by his immunization record. (ECF No. 40, p. 9.) He notes the importance of contemporaneous medical records, but also stresses the limitations on the weight given to inconsistent records. (*Id.* at 7-8 (citing *Curcuas*, 993 F.25 at 1528; *Lowrie*, 2005 WL 6117475 at *20; *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998); *La Londe*, 110 Fed. Cl. at 203-04, *Murphy*, 23 Cl. Ct. at 733).)

Petitioner argues that Ms. Perkucin was a reliable witness and that she persuasively explained why petitioner's immunization record was incorrect. (*Id.* at 9-10 (citing ECF No. 39-1, pp. 8, 12).) Petitioner further notes that Ms. Perkucin corroborated his own account, testifying that it was not her habit to administer two vaccines in the same arm. (ECF No. 40, p. 10 (citing ECF No. 39-1, p. 11).) Petitioner emphasizes that he consistently reported to his treating physicians that his Tdap vaccine was administered in his right arm, and that this account is consistent with the petition, affidavit, and Ms. Perkucin's testimony. Petitioner asks me to disregard the immunization record and instead, rely on his consistent reports to treating physicians, his petition and sworn affidavit, and Ms. Perkucin's corroborating testimony. (ECF No. 40, p. 8.)

In response, respondent stresses that petitioner bears the burden to prove the prima facie elements of her SIRVA claim and primarily contends that Ms. Perkucin's testimony should hold less weight than petitioner suggests because it is uncorroborated, specifically because petitioner failed to obtain and file his vaccine consent form. (ECF No. 42, p. 2.) Respondent "leaves it to the discretion of the Special Master to determine

whether Ms. Perkucin's testimony, absent corroboration by the consent form, is sufficient to meet petitioner's burden of providing the site of vaccine administration." (*Id*. at 3.)

## V. Discussion

Although the Rite Aid immunization summary contained in petitioner's medical records states that petitioner received his Tdap and flu vaccinations in the left arm, (*see* Ex. 4, p. 21), the record as a whole indicates otherwise. This is an issue that arises repeatedly in the specific context of SIRVA, both because SIRVA is a localized injury occurring near the site of injection and because experience litigating SIRVA claims has shown that pharmacy vaccine administration records are not necessarily reliable in documenting injection site.

In this case, Ms. Perkucin, the pharmacist that administered petitioner's vaccinations and who created the administration records at issue, testified that Rite Aid pharmacy immunization records of the type available at Exhibit 4, p. 21, stem from inputs completed prior to vaccination because the order for vaccination must be processed through the vaccinee's insurance before a vaccine is administered. (Tr. 8.) She explained that because the majority of people are right-handed, she "always [tries]" to list a left arm injection site on the pre-administration immunization records even before she speaks to the patient about where to complete the injection. (*Id.* at 8, 11-12.) Ms. Perkucin testified that this is the specific reason the record provided to petitioner's physician incorrectly indicates both vaccinations were administered in the left arm. (*Id*.)

This testimony is consistent with testimony from a prior case. In *Stoliker v. Secretary of Health & Human Services*, testimony by a store manager and pharmacist indicated that CVS pharmacy likewise inputs the site of injection, typically assuming left, into their electronic forms in advance of vaccination but keeps a paper copy of the vaccinee's consent form at the individual location. No. 17-990V, 2018 WL 6718629 (Fed. Cl. Spec. Mstr. Nov. 9, 2018). In that case, the pharmacist indicated that CVS policy resulted in about 10% of vaccine administration records needing to be amended as to injection site upon vaccine administration. (*Id*. at *4.) Thus, Ms. Perkucin's testimony credibly suggests that, with other record evidence indicating administration in the right arm, the contradictory notation on petitioner's pharmacy-generated vaccine administration form should be given less weight.

In this case, Ms. Perkucin also specifically testified that a separate consent form, completed after vaccination but not a part of this record, correctly indicates petitioner's Tdap vaccine was administered in his right arm. (Tr. 5-6, 10.) However, even without considering the fact of that missing record, Ms. Perkucin's testimony regarding the way in which Rite Aid records injection site information provides good reason for discounting the reliability of the "left" notation on the record at Exhibit 4, p. 21. Importantly, however, Ms. Perkucin's testimony calls into question only the "left" notation. The

immunization summary contained at Exhibit 4, p. 21 is otherwise sufficiently reliable to constitute evidence as to the fact of petitioner's two vaccinations.

Also important, petitioner consistently reported to his treating physicians, from September of 2017 through May of 2019, that his pain began following a right-arm Tdap vaccination. (*See* Ex. 2, pp. 4-40; Ex. 3, pp. 4-13, 23-26; Ex. 4, pp. 3-7, 34-35; Ex. 6, pp. 1-4; Ex. 7, pp. 4-11; Ex. 9, pp. 6-20.) Petitioner's statements to treating physicians are consistent with those made in his petition and sworn affidavit. (ECF No. 1, p. 1; Ex. 10, p. 1-2.) Prior cases by other special masters have held that consistent reporting to treating physicians that a shoulder injury was associated with a specific vaccination in the same shoulder constitutes probative evidence that can overcome a contradictory vaccine administration form. *See e.g.*, *Desai v. Sec'y of Health & Human Servs*., No. 14-811V, 2020 WL 4919777, at *13-14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Mogavero v. Sec'y of Health & Human Servs*., No. 18-1197V, 2020 WL 4198762 (Fed. Cl. Spec. Mstr. May 12, 2020). In this case, considering both the reduced weight of petitioner's administration records and the consistency of the contemporaneous treatment records for his subsequent injury, the record as a whole preponderates in favor of a finding that petitioner's Tdap vaccine was administered in his right shoulder.[3]

Contrary to what respondent suggests in his response and for the reasons stated above, this conclusion does not turn on Ms. Perkucin's specific testimony that she vaccinated petitioner in his right arm. Nonetheless, this outcome is further corroborated by, though not dependent upon, her statement indicating that "[petitioner] received the Tetanus vaccine in the upper right deltoid. The flu vaccination was administered to the left deltoid." (Ex. 11.) Ms. Perkucin later stated at her deposition that she did not specifically recall petitioner but testified that her statement was based on her review of petitioner's contemporaneously created consent form. (Tr. 5-6.) Ms. Perkucin also testified that it is her usual habit to administer one vaccine in each arm when a patient receives two vaccines. (*Id.* 11-12.) Although the consent form was not filed, Ms. Perkucin is a disinterested witness with personal knowledge of petitioner's vaccinations and the documentation of those vaccinations. Her testimony that she had access to petitioner's contemporaneously created consent form explains the basis for her testimony regarding the site of injection; however, her testimony relates to a fact that exists independently of the consent form. *Accord Travelers Ins. Co. V. U.S.*, 46 Fed. Cl. 458, 462-63 (2000) (noting that the best evidence rule "does not, however, prevent the introduction in evidence of facts about the document, or facts that exist independently of the document that are not given legal consequence by the terms of the document."); *Wonish v. Sec'y of Health & Human Servs*., No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991)(stating with regard to § 300aa-13(a)(1) that "it seems obvious

[3] Petitioner also filed an additional "Immunization Record Card" as Exhibit 1. That record indicates petitioner received his Tdap vaccination in his right arm; however, the provenance of that document is not clear on this record. Ms. Perkucin denied that this is a document she would have given petitioner. (Tr. 9-10.) Petitioner also had no recollection regarding the creation of this card. (Ex. 10, p. 2.) Notably, this card is unsigned and does not document the flu vaccine petitioner received at the same time. Because the remainder of the record evidence supports the finding that petitioner's Tdap vaccine was administered in his right arm, I do not rely on the Immunization Record Card in reaching this conclusion and it is therefore not necessary to resolve its origin.

then that not all elements must be established by medical evidence" and that "vaccination is an event that in ordinary litigation could be established by lay testimony. Medical expertise is not typically required.")

In his response, respondent indicates that "in respondent's view, the failure to obtain the consent form should result in a negative inference against petitioner's arguments." (ECF No. 42, p. 3.) In requesting an adverse inference, respondent relies on *Omni Moving & Storage of Virginia, Inc. v. United States*, 27 Fed. Cl. 677, 693 (1993), *on reconsideration* (June 2, 1993), *dismissed*, No. 93-5203, 1994 WL 745410 (Fed. Cir. Jan. 25, 1994). *Omni Moving & Storage* is inapposite. In that case, the Court of Federal Claims imposed the "adverse inference" sanction due to the failure to call two witnesses, observing that "[u]nexplained failure to call any known non-hostile person who has direct knowledge of the facts being developed by the party raises the inference that the testimony would be unfavorable or at least would not support the case." *Id.* at 693. However, in this case petitioner did initially locate Ms. Perkucin as a relevant witness and she did ultimately testify at respondent's request. Moreover, petitioner previously attempted to subpoena the document at issue and was unsuccessful. (ECF Nos. 10-11, 21.)

Although respondent believes the missing consent form constitutes significant outstanding evidence, adverse inferences relative to documentary evidence typically arise in the context of allegations regarding spoliation of evidence within a party's control and respondent has not substantiated that this or any sanction is warranted in the instant context. Vaccine Rule 8(b) provides that in receiving evidence, the special master "must consider all relevant and reliable evidence governed by principles of fundamental fairness to both parties." Although petitioner bears the initial burden of proof regarding the injection site, the document at issue is not under petitioner's control and petitioner has previously attempted in seeming good faith to secure the discovery at issue via subpoena. To the extent respondent believes the outstanding document could aid his defense or doubts petitioner's diligence, he has not articulated why Vaccine Rule 7 itself, which allows *either party* to seek formal discovery and request subpoena authority, is not an adequate remedy for respondent's concern regarding the absence of this document from the record.

## VI. Conclusion

In light of the above, the record as a whole preponderates in favor of the finding that petitioner's August 29, 2017 Tdap vaccine was administered in his right arm.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master